Your Honor, David Cantelme, appearing on behalf of the Speaker of the Arizona House of Representatives and President of the Arizona Senate. I have with me Rick Bistra, who will be representing the Superintendent of Public Instruction, and we are dividing our 20 minutes equally. I have the following points... Do you want me to do it, to ask the clerk to do it for you, or do you want to just take care of it? Would you mind, please? Would the clerk, please? It'll be ten apiece. That's right. Your Honor, I have the following points to make. First, the district court lacked subject matter jurisdiction to enter the 2001 injunction and all subsequent injunctions and the contempt order of December 2005. Second, the parties in this case are the parties, the named parties plaintiff and the class of ELL students in the Nogales district. Third, the act adopted by the legislature a few months ago does not violate the supplement, not supplant provisions of the Elementary and Secondary Education Act. And finally, the fines must be set aside because they're compensatory, and the district court held no hearing to determine the appropriate amount of the fines. And I'll begin with jurisdiction. Well, let me ask you something, a couple of minor factual questions, just to make sure I've got them straight. The money from the fines goes, it doesn't go to the students, right? It goes to the districts that have the students that don't speak English as a primary language? Yes, Your Honor. On jurisdiction, no party has disputed that the judgment entered in 2000 was final under Rule 54b. Plaintiffs pleaded claims in the second amended complaint for injunctive relief and declaratory relief. They were included in the pretrial order. But the judgment after trial afforded no injunctive relief. That being the case, plaintiffs having put the issue before the district court, if they thought there was an error that was inadvertent or intentional in denying or not providing for injunctive relief, they needed to move under Rule 59 or Rule 60 to set aside the judgment so that they could then get injunctive relief. But they didn't do either. Instead, more than a year later, with a final judgment providing no injunctive relief, they come back and they file a motion for injunctive relief, this time statewide, not just limited to the Nogales district. And at that point, Your Honors, the case was decided. It was final. There was not subject matter jurisdiction to provide injunctive relief as such. And I think I understood this from your briefs. What you're saying is they had a declaratory judgment on the Nogales district and it was all over, and then more than a year later they asked for an injunction against the whole State? That's it. And they also asked for injunctive relief, not just declaratory. But this is the important point. They asked for injunctive as well as declaratory relief. They only got declaratory. And they had not asked for an injunction in their original complaint, or they had, but they had gotten it. They did indeed ask for it in the original, in the second amended complaint, which was the last pleading before the district court. And it was in the pretrial order, the final pretrial order. So it was teed up, if you will, Your Honors. It wasn't granted. Now, moving to the next point. That order was never appealed, correct? It was never appealed, Your Honor. This is the only appeal in that case, what we have here before you. Now, the parties were the named plaintiffs, of course. And in the second amended complaint, they asked to have a class certified of the Nogales ELL students. Well, let me ask another minor factual question. Sure. The injunction that the judge issued, did it prohibit giving the Ames test, or did it just prohibit using the results of the Ames test as a sine qua non for graduation? That injunction that I'm referring to in June of 2001 had nothing to do with Ames. It was money only. Provide statewide funding for ELL instruction statewide. Ames, which Mr. Bistro will address in more detail, was tried to the district court, and the judgment denied relief. Tried in 2000. The judgment provided no relief on Ames in 2000. Specifically denied. Now, on the parties of the district court That was based on a disparate impact claim, though. True. That's true. Regardless That's not what the district court relied upon when he granted his injunction here. I agree. Okay. You know, I appreciate your concern about the injunction and the scope of the class, but your time is running out. And you got some — there's some really critical issues here with respect to whether or not this is a compensatory or a coercive fine. Let me address that. And I think you — you know, from my — you know, I just think — I don't want to see you waste your time and address — and pass over what I think are really important issues. Let me come right to that point, then. You have an order issued in December 2005. The order says the State must comply with prior decisions of this Court. And if you don't, there's an escalating series of fines. That order doesn't say coercive. It doesn't say compensatory. It just says there's an escalating series of fines. Now, the Attorney General came back in January and filed a motion to clarify. And plaintiffs did not oppose it. And that was clarified that the fines were to go for the benefit of ELL kids in all districts. That makes it compensatory. Now — Why does that make it compensatory? Because it's intended — It's clearly intended at the outset, if you read the district court judge's order, that it was coercive. He wanted the legislature to pass a bill to pass a law that complied — that implemented the original judgment. Your Honor — It's quite clear from reading it that the original order in December was coercive. He wanted compliance. You can't just read that order, however. You have to read that plus the January order. Well, that's — well, you start out. I think you have to start out with the notion that it was coercive in December. And the question is whether or not, by allowing the money that had been deposited into the — into the special fund to be dispersed to the district, somehow or other converted that order to a compensatory order. But the district court was very careful. The order did not go to the plaintiff in this case. It went to — for the benefit of all the students in the — all these English ELL students throughout the State. It did, indeed, Your Honor. I don't quite understand why that makes it compensatory. Well, you have two categories. It's either coercive, in which case it goes to the Treasury, and this Court has twice held that in both Shuffler and the D'Analco case, or it's compensatory. There's no third category. You can't make it coercive and then distribute the money other than to the Treasury. So let me ask you this. Could — if we determined that it was coercive, could we just reinstate that order? I mean, just basically modify the order and let the money go to the U.S. Treasury? You would have to remand for this reason. Because the district court never went through the analysis, even for coercive orders. There is a standard, and that standard must be met. And it has to be evaluated under that standard. And that standard is in the United Mine Workers case. And it must be — the district court must evaluate the character and magnitude of the harm and the effectiveness of the suggested sanction. Well, the district court judge's order here in 2000 was pretty — you know, it was pretty serious. I mean, the district court made certain findings back in 2000, the original judgment here, which indicated that this was a — this was a very serious problem. And the district court made it clear what needed to be done. Six years later, nothing had happened. Well, it's not true that nothing had happened. Oh, there had been an interim order, but there — and there had been measure steps along the way. But the district court — there has still not been full compliance with the district court's order. I will grant you that that's how the district court regarded it. He was running out of patience. I would agree with that. But I would also agree that there were many measures in between, and that that court had found that the increase to $350 per child was adequate, at least on an interim basis. But I will agree with you. It is true that the district court in December of 2005 was not satisfied. But the problem, Your Honor, is he didn't go about it the right way. There are standards for setting fines, and there are standards for the purposes for which they can be used.  Let me ask you a question. What's the authority for the proposition that if it's a coercive sanction, the money cannot go to the persons who suffered the harm? General Signal Court v. D'Analco, 787 Fed 2nd, 1376. Thanks. I'll reserve the rest of my time. Mr. Bistro. If you may please record, my name is Rick Bistro, and I represent the Superintendent of Public Instruction, Thomas C. Horn, who is sitting at the council table. I will deal with three broad issues, satisfaction of the 2000 judgment, propriety of contempt, and Ames. Let me just get right to the question, Your Honor, that you asked about with regard to Ames, the disparate impact of the initial January 2000 decision. First of all, the Second Amendment complaint clearly implicated funding and minimum competency tests. And the pretrial order, which is at CR-167. Well, there's no question about that. Page 52. That's quite clear from his order that from what was tried in the three-day or two- or three-day trial. Yeah. What was tried was the disparate impact claim. That's correct. But also in front of him for race-judicata purposes, and it was in the pretrial order, was the issue as to whether, because of inadequate funding, the Ames test ought to be required. The district court at that time was not contemplating what a remedy would be or what the remedy should be at the time he was determining whether or not there had been a violation of the Federal law, the Equal Educational Opportunity Act. Remedy was not in focus at that time. He had to first determine whether on the evidence that was presented to him whether or not there had been a state was in violation of the EEOA. I understand that with regard to funding. But with regard to Ames, he found that there's inadequate funding in the original 2000 decision. That's correct. He also found there was no violation, no disparate impact. They had claims that failed to meet their burden to prove that there was a discriminatory impact on race or ethnicity. Yes. But the issue of inadequate funding, he found inadequate funding in the 2000 decision. Right. But it was also in front of him at that time in the pretrial order that because of inadequate funding, ELL students should be excused from having to take Ames as a graduation requirement. All right. Let me ask you this. Let me make my question clear on that. Does everybody still take Ames, only you don't have to pass it to graduate if you're an ELL student? Or do ELL students not take Ames? No. ELL students do take Ames.  to graduate. Now, in the 2000 judgment, the challenge was to the validity of that test because it had a disparate impact. And I gather if the plaintiffs had prevailed on that claim, the remedy would have been to enjoin use of that test, period. Correct. That's not what happened here. As Judge Kleinfeld has carefully pointed out, what the district court has done here is not to enjoin the use of that test statewide. It's just that it cannot be used as a — I don't quite know how to use it, what terminology to use, but it can't be used as a — Judge Kleinfeld used the term sine qua non for graduation or as a requirement for graduation to get the diploma. That is correct. That is correct. That's what the current injunction does, in fact, implicate. And one of our arguments is that it was — there's a number of arguments, but one of our arguments is that that was barred by res judicata because that issue was in front of the judge way back in 2000, and you can't relitigate it. Six years later. But let me go on to some other issues. First of all, let me turn to satisfaction of judgment. In 2000, the district court found that the funding level of $150 combined with other resources was not reasonably calculated to implement ELL programs in the Nogales Unified School District. The court did not reach that decision in a vacuum. It found the monies were insufficient because they did not provide the tools for Nogales to implement ELL programs, and he made a whole series of findings about that, you know, after — after he found that there was inadequate funding. The court found that there were an inadequate number of classrooms, that there weren't enough teaching materials, that there were inappropriate student-teacher ratios, that there was a lack of tutoring, and so on. Clearly, had there been no deficiencies in the Nogales Unified School District, the case would have gone the other way. But now those deficiencies with regard to lack of classrooms and tutoring and insufficient materials and so on, those deficiencies have now been cured at current funding levels. The appendix to our reply brief on this issue sets forth 25 uncontroverted facts made under oath that have never been rebutted. Did the district court make a finding on that? No. It made zero findings on that. If you take a look at April 26, 2000 — Excuse me. How is this — He makes a passing reference. How is this presented to the district court? In what form? Was there a motion to leave the judge — There was a motion. Hold on. Let me ask. Let me lay this out for you. Was there a motion to deem the judgment satisfied, a motion to lift the injunction or modify the injunction that had been entered in December? Yes, Your Honor. Was there a motion to modify the order requiring a cost funding that is no longer — cost study that is no longer necessary because everything has been taken care of? Yes, Your Honor. What was before him? I can't give you the exact date, but around the middle of March, there was a motion filed by the intervenors to purge the contempt, and it was also a Rule 60b-5 motion to declare the judgment satisfied. We joined in that motion. The superintendent joined in that particular motion and then provided a tremendous amount of evidence from the Nogales Unified School District that all of the deficiencies that were complained about way back in 2000, in fact, had been satisfied. Indeed, we provided an affidavit from the superintendent of the Nogales Unified School District from 2000 through 2005 who indicated funding was no longer a problem in Nogales, that really what mattered in that particular school district was leadership. We also appended, if you take a look at the appendix, if you take a look at the appendix to our reply brief in our latest appeal, you'll see all of these uncontroverted facts, and you'll also see that these ELL kids, kids who have been tested after two years of instruction, are doing remarkably well, in fact, are exceeding the State average on Ames tests. So we take the position that the Court, in view of the uncontradicted evidence that was in front of it, should have granted that Rule 60b-5 motion. There was no evidence to go the other way. Had there been evidence to go the other way, we also made a formal request for an evidentiary hearing. He didn't give us that either, nor did he make any findings or reason why that motion was denied in his April 26th, 2006, order. Your Honor, I'm going to sit down and reserve the rest of my time. Kennedy. One question. Are we concerned with just Nogales District or the whole State? That's a complicated question, but the original case was framed in terms of Nogales only. Exactly. All of the evidence that has ever been presented with regard to inappropriate conditions has always been Nogales. Nogales is the benchmark. If the conditions in Nogales have been satisfied, Your Honor, then that was the school district that was picked by the plaintiff's lawyer. If those conditions have been satisfied, then that would apply to the entire State. And there's some good reasons why he picked Nogales. Nogales is the border town. It's 80 percent of the kids in Nogales, Your Honor, are poverty-stricken. Seventy-five percent are not English-speaking. Yeah. I'm not sure I understand that one statement you said. If Nogales, the problem there was clarified, that it would apply to the whole State? Yes. How does that work? Because they are the Nogales. They are the plaintiffs. And it's always been about Nogales in terms of effect of the lack of State funding. I'm confused. As a matter of fact, if you take a look at the original opinion in the case when they brought in evidence about the Phoenix Union High School District on disparate impact, the Court said, wait a minute, that's irrelevant. It doesn't deal with Nogales. I'm confused about something. You're saying the complaint, the evidence at the hearing on the injunction, were about Nogales and nothing but Nogales, but the judge issued an injunction applying to the whole State? In 2001. That's what Mr. Gontelme was talking about earlier. Yes. And then the answer to everything being fixed in Nogales is, but that doesn't matter. The injunction applies to the whole State. That is correct. You never had findings of fact on the whole State? Never. Hearing about the whole State? Never. Never happened. As a matter of fact, if you take a look at the interim order of 2002, when he found us to be in compliance, when the legislature, based on a study, a cost study that was performed by the Arizona Department of Education, when you take a look at that interim order, what the judge said at that time is, based on the estimated costs of providing an ELL program and the fact that it's now appropriately funded, on an interim basis, we are finding you in compliance in 2002. Could the district court have ordered the legislature to just take care of Nogales? In other words, adopt special funding or provide special funding just to Nogales and not deal with the other students throughout the other ELL students throughout the State? Your Honor, I've never looked into that issue. Clearly, if you take a look at the beginning portions of the opinion in the original Flores v. Arizona case, it deals with funding Statewide, and then it gets narrowly tailored to how that applies to Nogales. Would I look to me like what was trying to be accomplished here, whether you just look at this in terms of the Nogales district or other ELL students around the State, but that in order to accomplish, to carry out the objectives of the original order, the State had to redo its funding mechanism. The parties seemed to recognize that because afterwards the parties, they proposed, I mean, they agreed to this study that was going to lay the foundation for a revamped funding mechanism. And then all this other stuff happened along the way. And now when the rubber hits the road, so to speak, everybody backs off and says, oh, no, no, no, this is only all about Nogales now, and you can't do all this stuff. You can't force us to deal with this Statewide. But it looks like what was trying to be accomplished here was in order to carry out the judgment, the district court had to order the State to adopt measures that would, in the end, would benefit the whole State. Well, we don't know that because there's never any evidence with regard to any other school districts in the State at any time. So, for example, in Paradise Valley School District or Scottsdale Unified School District, no one knows whether, based on the funding levels back then, whether it was sufficient or not with regard to that. Breyer. There was never any appeal, though, of that original injunction that applied to the whole State. Is that right? That is correct, Your Honor. So the — But there are no findings either in all, as I said. The matter — Let's suppose, hypothetically, that it's an entirely unjustified injunction, no findings of fact, no adequate evidentiary basis at all, but it's not appealed. Let's imagine that perhaps it's collusive. The school districts all over the State would like more money for schools and less for highways and everything else. So they direct their attorneys, leave this alone. We're happy losing. So it's not appealed. Is there any way to penetrate that, or is it all over? That's a good injunction at that point. Your Honor, I think there is a way to penetrate it, and one of the ways that we've penetrated it is by showing you that under these new funding levels, adequate funding is adequate right now in the school district that they chose to be representative of the State, and that's Nogales. Your Honor, I'm going to sit down, if I might, so we can preserve — You're saying the way to get to it is change of circumstances. Yes, there is a change of circumstances. That is correct.  Thank you, Your Honor. Afternoon, Your Honor. My name is Tim Hogan with the Arizona Center for Law and the Public Interest, representing the plaintiffs' apologies in this case, dividing our time with the State of Arizona equally. Additionally, Mr. Cardenas, who is representing the State, is going to be addressing the supplement, not supplant, issues that the most recent legislation raises. Let me respond to a couple of questions that have come up and confirm, first of all, that the injunction, most recent injunction, we've asked for a number here, the most recent injunction that the plaintiffs asked for is to stop using the AIMS test as a graduation requirement for English language learners, not to stop administering the AIMS test. The AIMS test is still administered to all students in Arizona. It is one of a number of graduation requirements currently for students in Arizona. So we've just asked that it be stopped being used as a graduation requirement for graduating English language learner seniors. It already ordered that it stop, that they no longer use it as a graduation requirement for ELL students. That's not right? Until it was stayed by this Court, Your Honor. I get it. So that's the confusion. Right now, English language learners still have to pass the AIMS test while that stay is in effect. That's our Court's stay.  April 6th or thereabouts, the stay was entered, I believe. Second, there's been discussion about whether this case is just about Nogales Unified School District. The plaintiffs are a class of parents and children from Nogales, but if you look through the second amended complaint, which was referenced here, it's clear that what the plaintiffs were seeking was systemic relief addressed to the state's school finance system, not to a particular school district. Was there evidence that the level of funding was not what the federal statute deems appropriate? It uses the word appropriate, as I recall. The complaint, first of all, makes it clear that Nogales is an exemplary school district in the sense that. Do you understand my question? I asked whether there was evidence of less than appropriate funding for locations other than Nogales. No, Your Honor. The evidence at the trial in this case was directed to the Nogales Unified School District and, I mean, more than anything else, sufficient to demonstrate that there was harm as a result of the clearly arbitrary finance system. Evidence was just Nogales evidence. That's right. Let me ask you a couple other things. We have this Ninth Circuit decision, Clark v. Coy. Are you familiar with that? I am not, Your Honor. Oh. It's a decision where the district court had prohibited California from implementing an eligibility restriction for California. I can't remember what you call it. It's basically free dental care for poor people. But then there was a change in some other legislation, and our court said that the U.S. District Court could not impose any remedies for the original failure of California to comply with federal law without having a hearing on the effect of the new legislation and how that might change things. It said that federal courts must be sensitive to the need for modification when circumstances change. I'm wondering why that doesn't apply to your case as well because of all the new money that's come in through the No Child Left Behind Act. Well, for one thing, the money that comes in through the No Child Left Behind Act is not available for English language learners because of the supplement, not supplant provision. But more generally, Your Honor, the answer to that ---- Tailor the injunction just to limit the supplement, not supplant language. And that's the point I'm going to speak to. On its face, this legislation did not satisfy the Court's previous orders that the funding not be arbitrary and that it be based on cost. That doesn't speak to my change of circumstances issue. Let me give you a hypothetical to make it clear. Let's say 10 years ago, because of discipline problems in the schools and some disparate impact, this is totally hypothetical, the federal district court issued an injunction saying there has to be a telephone in every classroom so the teachers can call for help or call the principal or the police when there are discipline problems in the classroom. The school bureaucracy totally blows it off. They do absolutely nothing to comply. Ten years later, they're back in court for lack of compliance. But during that 10 years, everybody's gotten cell phones. Every teacher has a cell phone. There's no reason anymore to have a landline phone on every teacher's desk. Would the district court be able to impose sanctions for blowing off the injunction and order the schools to put the landline on every desk without holding a hearing on whether the now universal cell phones make it unnecessary to implement the original order? I think the district court would be well within its authority to do so, Your Honor, whether it be unreasonable under those circumstances to do so is another matter. But the district court certainly, when the defendants blow off a ---- You're saying it would not be an abuse of discretion to say I don't care if it's stupid. You can't blow off the district court, put a landline on every teacher's desk. Well, I'm distinguishing between the authority to do that and whether it constitutes an abuse of discretion to do that. Certainly the district court would have authority to punish that behavior as a contempt. If the defendants had blown off the district ---- That would be a criminal contempt. That would not be a coercive sanction. Well, that may well be, Your Honor, depending on the nature of the ---- you're correct. I mean, it may well be ultimately that it would be a judge to criminal contempt for violating the court's order. Could the judge ---- And it may well be ---- ---- coercive sanction. You're going to pay a million dollars a day until you put a landline on every teacher's desk. Under those circumstances that you've outlined, I think it would be an abuse of discretion, Your Honor. Why here doesn't the court have to hold an evidentiary hearing because of the changes in the last six years? A lot of ELL students doing better than average on AIMS, which suggests something must be working. The change in the program from English as a second language to immersion, the injection of new Federal money, those all seem like real changes. Why shouldn't it be required under this Ninth Circuit case, our court that we're bound by, to hold a hearing on the effect of the changes? Because the one thing that hasn't changed, Your Honor, is the requirements of the Equal Education Opportunities Act, which requires that funding be based on cost. Everybody's understood that for the last ---- actually, for the last 20 years or thereabouts. What the act says is a little different from that. It says that there has to be an appropriate amount of funding so that the children can learn English. Well, it doesn't even say that, Your Honor. It says the state has to take appropriate action to assist students to overcome language barriers that impede their equal participation. And the appropriate action provision of the Equal Educational Opportunities Act has been interpreted by Costaneda to mean a three-pronged test. This case is brought under the second prong of that test, challenging the resources, the adequacy of resources that have been committed to the educational methodology that has been chosen by the state. Appropriate action to overcome language barriers, if they can show that the language barriers have been overcome by whatever action they're taking, I don't get where you have a warrant to say, but they still should give us more money. Well, that issue is addressed in Costaneda as well, Your Honor, because the test requires the commitment of resources. You don't look at outcomes any more than we could prove our case by ---- Well, they need to find better ways of doing it as well, Your Honor. But the issue is that the state has to take appropriate action to assist students     at least one of the issues, and it comes before looking at outcomes, because resources are what create the opportunities for those students. I don't understand that. Washington, D.C., the best-funded schools in America and the worst. North Dakota, among the worst-funded schools and the best. I don't understand why resources come first. Because resources are what create the opportunities for these students. How do you know that we wouldn't have many, many more students doing much, much better if we had adequate resources in place? That's the issue, not whether or not they're performing at average, below average, above average. That's why the Costaneda case requires the commitment of resources before you look at that answer. I'm looking at the total lack of correlation across the nation between resources allocated to schools and educational outcomes. So I guess we do know the answer to that. Well, but there's been a decision made. Which there's no support. There's been a decision made in the Equal Educational Opportunities Act by Congress that resources do make a difference. It doesn't say that. It says the failure by an education agency to take appropriate action to overcome language barriers. It says appropriate action. It doesn't say to provide greater resources. But appropriate action has been interpreted and applied for 20 years now from the Costaneda case as meaning once you've chosen an educational methodology, and the methodology is you can choose any recognized methodology, whether it's bilingual, immersion as we have in Arizona and as the voters approved, English as a second language. The second prong is the state has to commit adequate resources to effectively implement that methodology. That's what Congress, as interpreted by the courts, has said in the Equal Educational Opportunities Act. Let me ask you, along the lines of Judge Kleinfeld's questions and following up on the questions I was asking counsel a minute ago, I don't see why the State or why the superintendent or the speaker, whoever, could not have filed a motion anywhere along the way after the Court issued an injunction order that said, you know, we move the Court to either modify, to vacate the injunction on the grounds that we're now in compliance. Whatever they want to present is showing that they're in compliance. Now, counsel just said to me that they tried to do that with a motion, I guess, back in March. Well, I think the motion came, the first motion to purge. And the district court just denied it without conducting a hearing of any sort. The first motion to purge came in December, I believe, Your Honor. They could do that, right? They could have done that any time within the last six years. And, in fact, some of the changes that they've referred to here, the Students First Act was enacted in 1998, No Child Left Behind, of course, became effective at the beginning of 2001. I mean, the voter proposition that increased, had largely the effect of increasing teacher salaries, was four, six years ago, something like that. Those, at any point along the way, you're absolutely correct. Well, am I correct that this Castaneda case you want us to rely on, that's Fifth Circuit, 1981. And the Clark v. Coy case that you were not aware of, that's Ninth Circuit, 1995. That's correct, Your Honor. I mean, one goes to the other. You're saying we're not bound by a Ninth Circuit case, we're bound by a 25-year-old Fifth Circuit case. I don't believe I said that, Your Honor. I think I was attempting to distinguish this case from the Clark case that you explained. I'm going to — I understand that the district court relied on the Castaneda formula when the district court entered its original judgment back in 2000. Absolutely. That was never appealed, correct? Correct. I'm going to turn it over to — I've already intruded on his time. Is there no further questions? Actually, you intruded on all the time. It's almost 24 minutes. Oh. You're arguing alone. No, he said it at 10. No, I think I've gotten 14 minutes. Thank you. May I ask, Your Honor, does that mean I have 10 minutes or 6? Take 8. Thank you. Good afternoon. My name is Jose Cardenas. I represent the State of Arizona along with my co-counsel from the Attorney General's Office, Susan Siegel. I want to focus principally on two things. One is the federal funding restrictions that are the reasons why the State of Arizona has such great concerns with HB 2064. And the other is a serious miscitation of authority found in the intervener's reply brief. Arizona gets over $500 million a year annually in federal educational funds. In exchange for those funds, it makes written commitments that it will administer those funds in accordance with all applicable statutes, and further, specifically, that it will use those funds so as to supplement and not supplant state and local dollars. The problem with HB 2064 is that it directly conflicts with those prior written commitments of the State of Arizona. Judge Collins held that the statute on its face violated those federal funding restrictions because, in effect, the legislature wrote federal funding restriction violations right into the statute. Let me ask you this. You're talking about 2064 now? The statute. Yes, Your Honor. Let me ask you this, what I found somewhat problematic here. As I understand it, 2064 does not go into effect the way it was written. The funding provisions do not go into effect unless the district court says that it complies with the original order. The only thing that doesn't go into effect, Your Honor, is one portion. It's the increase that takes it from the original. The money. No, no, no, no. It's the increase. Well, the added money. Wait. The added money. The added money. That will take it from 355 to 432. So it is in effect. So isn't the legislature essentially asking for an advisory opinion? Well, they put that requirement in, and the court would have had to consider it anyway. But even if that wasn't there, Your Honor, what you'd then be dealing with is a situation that would be worse, actually, for the legislature's point of view, because then we're focusing just on the adequacy of the 355. Well, in fact, the legislature sat over here and said, well, look, you know, this is what we're going to do, but it's really not effective. We don't want this to really we don't really want to do this unless the district court says, okay, you can do that. That takes care of all the problems. Everything else goes into effect, Your Honor. The only thing that doesn't go into effect is the one beneficial part. Let me ask you this. Without that money, what's left? $355 in group view weights, and then you still have the. What's in the 2064, without the added money, what's there for the ELL student? $355 per ELL student, plus the way the scheme is worked, it's set up so that the school districts determine their actual incremental cost of funding ELL education. They then are required to offset from that all these federal funds, and then they get whatever the group view weight is, which right now, without the extra money, is $355, plus whatever the difference is between those offsets and the actual incremental cost. So the statute goes into effect. If the statute is not into a, doesn't go into effect, or if it's in effect, without the funding, let me rephrase that again. If 2064 had not been adopted, how much money is going to ELL? It's the $355 per student. You multiply that times the $154,000. So this 2064 added new money? One portion added new money, yes. Added a chunk of new money? Yes, $14 million. It also did some other things. Yes. Okay. Now, are those other, would those other measures still be in play if they didn't add the additional chunk of money? Yes, because the only thing that's conditional is that $14 million. Okay. And what you have is ---- Counsel, what does the State have to do to purge itself of contempt? Suppose they decide we're going to turn over a new leaf. Politically, everybody's on the same page now. We want to do everything the district judge has ordered us to do so that we can stop these fines. I can't figure out exactly what it is they have to do. My point of view, fairly straightforward, what Judge Marcus says is you determine what your programs are. He didn't tell the State what to do. He said, and then you figure out what the actual cost is. The problem that Judge Marcus found was that there was no rational connection between what the State was spending and what it actually cost. But then the judge can still say, no, I still don't think it's appropriate, or your program is not satisfactory. No, not at this stage, because the judge, neither Judge Collins nor Judge Marcus has ever said what you are doing is wrong. Your methodological approach is wrong. It's never been said. What they've always said is whatever you're doing, fund it adequately. And you fund it adequately by determining what it actually costs. Now, this legislation, in one respect, is an improvement over what's gone before because they do provide a system whereby, at some point, we will know what the actual costs are. Now, the problem is they then deduct from those actual costs all of the Federal monies that would otherwise be received in determining what the State's contribution would be. And that's a violation of two Federal funding restrictions, the first one being 7902, which says specifically, which prohibits exactly what HB 2064 requires, and that is consideration of Federal funds in determining the amount of State aids, that same language runs directly in conflict with the supplement, not supplant restrictions, which are set forth in each of the Federal funding statutes. Are you telling me that any program whatsoever and any level of funding whatsoever, so long as it funds that program, will purge the contempt? What I'm saying is, assuming that you have an adequate program, which the courts have thus far assumed, because they haven't challenged whether it's English immersion or bilingual education, and you show that you're actually funding what that program costs, that should be an adequate response to the existing court order. The judge will decide if it's adequate. I beg your pardon? The district judge will decide whether it's adequate. Unless there was some credible evidence presented as to why it's inadequate, that would not be the case. Sure there will be evidence that it was inadequate. Well, there's been numerous cost studies presented, Your Honor, that show that the amount, whatever it is, is in excess of what's provided for, even if the additional monies were provided. Surely, there's sure to be evidence that it's inadequate. I have never heard of an educator who thought their resources and programs were adequate. That may be the case, Your Honor, but we're not even at that point. In all the evidence that's been presented today. I was interested in a point that you made, and that is that the method of determining costs was quite reasonable. That is, the method of having each school district and so forth report what is required, and then with those districts that do not have adequate amount of resources, that they can get it in turn from a State pool that's set up for that? Yes. And the problem with that, though, is that they have to deduct their Federal money, so you have to do that. Well, if that — yeah. I'm taking that aside. I understand your point on that, that it has to supplement and not spend. But just the method that would be used there, you would agree that that's adequate? To the extent it does what Judge Marcus is requiring, which is determining what the actual costs are, then, yes, it seems to me that is responsive to what the Court was asking for. So it would be a reasonable way of determining what the actual costs are. It would depend upon what the models are that the State comes up with, but it seems to me that that's on the path toward responding to that part of the Court's order. It's probably more reasonable than the cost study that was done, which nobody could really accept. It's very hard to do a cost study, I think. It is indeed, Your Honor. And our point being that all of the cost studies, though, at whatever level, and these have all been ranges of numbers, the numbers that are proposed in HB 2064 are lower than any of them have provided. Now, with respect to the supplement not supplant, it's absolutely clear that if you're taking Title I monies and paying for programs in Title I schools that are being paid for by State dollars in non-Title I schools, you've got a clear supplement not supplant problem. All the cases we cited, Hawaii v. Bell, Indiana v. Bell, show that that's true. And it's true whether or not you're talking about bilingual funds, which was Indiana v. Bell, which is also discussed specifically in the statute. And that brings me, if I may, and I'll come back to some other points if I have time, to the miscitation I was talking about. In the intervener's reply brief, you will see them citing to an OMB circular, and they cite the language suggesting that the one exception in Title I to the supplement not supplant restriction applies to bilingual funds, and they cite this OMB circular, and they cite half of the paragraph. And you'll see that if you compare that to the actual language of the circular. The part they leave out is it makes clear that the exception that's referred to there to Title VII, not to Title I, and it's old Title VII as existed, and this is a quote from the circular, prior to NCLB. Old Title VII dealt with direct grants from the Department of Education. It still exists as part of Title III, but it's a part of Title III that has never been activated. Arizona doesn't get its monies from that part of Title III. The part of Title III that Arizona does get its monies from has the supplement not supplant restriction, and it doesn't have that exception for bilingual funds. The short of it is that you cannot avoid the federal restrictions that are imposed upon that $500 million that Arizona receives annually, and it was no abuse to find that HB 2064 violated federal law. Indeed, it would have been an abuse of discretion for the district court, Judge Collins, to have held otherwise. I guess the feds come around and do audits. Is that what this is all about? They do audits, but even before we get to that point, because one of the arguments is, well, let's just wait and see if the federal government catches us. No, they might not do anything. Big pardon? They might not do anything. Well, they might not do anything, but the impact is felt immediately because under the statute, when school districts submit their budget request, they have to deduct that money right now. So the harmful impact is felt at the moment that they submit their budget request, and that's one of the problems with this statute. And, Your Honor, if I may address the question of changed circumstances, it seems to me that there would be an argument for changed circumstances if you could come and then we're just focused on Nogales, which I don't think is the appropriate focus because this is a State funding scheme. That's what Judge Marcus was talking about, and that's what they're saying. Why couldn't the State just take care of Nogales? Well, here's my point. Even with respect to Nogales, the order is that you have to have a rational connection between the amount you're spending and what it actually costs. And if you look very closely at everything in the superintendent's briefs and in the intervener's briefs, you won't actually find anything that says we have gone out and we have determined what it actually costs to adequately educate ELL learners, and here's the amount of money. What they say is, you know what, we're doing pretty good, and we've been able to do that with the money we have. But they don't make the actual statements that would satisfy and might provide a changed circumstance, as Your Honor was talking about. So I think it's inappropriate to focus just on Nogales for many reasons, not the least of which that the appellants themselves assume you have to decide the HB 2064 issue. If you read the lead argument in the intervener's brief, for example, the heading is the reforms of Arizona education funding since 2000 and the adoption of the act in 2006 satisfied the judgment and resulting orders. It made sense for the district court to first consider the legal issue, which was the adequacy of HB 2064, before even getting to any question of an evidentiary hearing. But that the additional funding, though, still isn't, it would never be effective without the district court signing off on it. That's right. Right. But that's the only part that doesn't go into it. I find that problematical. Let me ask you, I have one before you sit down, And that is, it was the State that asked the district court to use the money in the fines that had been set aside? Yes. To distribute it to all the districts. Is that correct? Yes, Your Honor. It made sense to us. All right. Well, I just have one observation. This seems to be an extremely awkward way of trying to get a policy with regard to English as a language. To be able to get both houses of the legislature and the governor and the court all to agree on a particular method of doing this, it seems like there ought to be a better way than what we're doing here. Well, I wouldn't disagree with that, Your Honor. But again, I would point out that in many respects, what the Federal court has required is not that intrusive. What they've said is, you decide what your programs are, and you decide what those cost. And that's what the Court has been waiting to see, and that's what's not been provided to date. Thank you, Your Honor. Thank you, counsel. Please, the Court, I want to respond to three questions that came up, and I've got very limited time, so I'll move very quickly. We did file a motion to set aside the judgment as satisfied. We did that on March 24, 2006. It's item 422 in the clerk's record, and we had the entire evidentiary base to support that. Number two, the question on Nogales only. The order should have been, you fix Nogales. It may have been up to the State authorities that the only way they could do it is statewide, but that's the State's problem. The Court itself should have said, fix Nogales only. They were the only parties. Except for after the judgment was entered, there was a lot of cooperation at that time about what was going to happen. Your Honor. Between the parties. The record doesn't support that. But from reading the briefs, you get that feeling. Well, that's the after-the-fact rationalization. It's like a party. It's like something, as Judge Hud would just point out, something happened down the river that positions changed down further, further down the line. The positions may have changed, Your Honor, but the fact remains these are the parties, these are the orders. Right. I understand that. And so on. I understand. Last, how do you penetrate the 2001 injunction? There wasn't subject matter jurisdiction to grant that injunction. Does the Court have questions? Thank you, counsel. Your Honor, just to clarify something. In the original 2000 opinion, there were tons and tons and tons of findings that were made, all of them dealing with Nogales. And we have shown, through uncontroverted affidavits, that those findings no longer hold true. And one of the reasons that those findings are no longer true is something that you've already alluded to, is the fact that we, the State of Arizona, has provided millions and millions of dollars of additional money, not just in the Group B weights, but we have given additional monies so that they can purchase materials. We've given brand new money so that they can have classrooms. We have given, we have millions of dollars, for example, in compensatory instruction, and you'll see in one of our uncontroverted affidavits. Are there any limitations on the use of that money for ELL? Well, they, no. There's no limitations. They could use it for whatever. Take it for tutoring. Take small groups after school, before school. That's what the, as a matter of fact, one of the interesting points is, is that statewide, the school districts throughout the State of Arizona have only been using half of the compensatory monies that are even available. Again, that's one of our uncontroverted affidavits. Nogales has only been using 50% of its money. There, in any event, there's been a tremendous amount of additional resources that have been provided. One of the things that occurred early on when the motion for sanctions was initially brought before the court was that we indicated to the court at that time, look, we have, it's a brand new ball game. We said that in addition to the base level of funding, there is $1,400 per ELL student available out there between state and federal sources, and there is now adequate funding in the school districts. And we asked for a hearing so that we could show what the effects of that was going to be. And we were never provided a hearing on that particular issue. Thank you, Your Honor. Thank you, Counsel. Flores v. State of Arizona is submitted. We are adjourned for today.
judges: Hug, Kleinfeld, Paez